## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | 3:17CR285(AWT) |
| v. | |
| WILLIAM FUSCO | February 19, 2019 |

### UNITED STATES' MEMORANDUM IN AID OF SENTENCING

The government respectfully submits this memorandum in aid of sentencing for the sentencing hearing of the defendant William Fusco, scheduled for February 25, 2019.

### FACTUAL BACKGROUND

This is a dark network drug distribution case. The "Dark Network" refers to any portion of the Internet that can be accessed only with specific software, configurations or authorization. The most commonly known Dark Network is The Onion Router, otherwise known as TOR. People who access the Dark Network use a series of sites that anonymize their internet traffic, thereby making it difficult for law enforcement to track them via an Internal Protocol address. To further criminal activities, those distributing illicit goods, including narcotics, have established websites on the Dark Network, known as DNMs, on which they advertise and sell the illicit materials. Some of the most famous DNMs include Silk Road, Alphabay and Dream Market.

This specific investigation began when United States Postal Inspectors noticed that a large number of packages were being sent to an individual who ultimately cooperated with law enforcement ("CW-1") at his residence in Connecticut from Pennsylvania. Most packages were sent using stamps that were anonymously obtained. In early June 2017, Postal inspectors interdicted one such package after a dog alerted positively on the package. A search warrant was obtained for the package, which was found to contain steroids. A second warrant was obtained to

1

do a controlled delivery to CW-1's home. Once inside the home, agents discovered the following: (1) Two industrial pill tableting machines; (2) tool and dye molds; (3) one electric powder mixer/hopper; (4) approximately 65,122 Xanax tablets; (5) approximately 792 grams of Alprazolam powder; (6) almost 12,000 steroid capsules and more than 321/100ml liquid steroid vials; and (7) approximately $8,900 in cash.

CW-1 immediately cooperated and admitted that his friend Bill Fusco paid him to send packages throughout the country. He explained that when CW-1 was hard up for money in the summer of 2016, he asked Fusco if he could work for him. CW-1 knew that Fusco had been selling steroids on the dark web for years and that it was profitable. Fusco told him that he could be a "shipper" for him. Fusco told CW-1 that packages would come to him and that he would need to re-package them and send them to customers. CW-1 admitted that these packages contained controlled substances.

In December 2016, Fusco asked CW-1 to buy a pill press. He explained that they could make more money pressing Xanax for distribution. The press was shipped directly to CW-1, and Fusco went to CW-1's home in January to assemble it and show CW-1 how to press pills. During that process, they broke the machine and ordered a new one. From that point, alprazolam powder – the active and controlled ingredient in Xanax – would either be sent directly to CW-1 or Fusco would bring it with him when he visited CW-1's home to press pills. Fusco marketed these pills on dark web forums such as Alphabay. He would send CW-1 lists of where to send specific drugs via encrypted emails. CW-1 did not have a presence on the dark web himself. CW-1 estimated that he sent 30 packages per week on average.

CW-1 explained that Fusco wanted him to come to Philadelphia to pick up a new pill press. Based on this information, agents surveilled and recorded the meeting where CW-1 picked up the press from Fusco. Warrants were also obtained to search Fusco's home and arrest him. From Fusco's home, agents seized the following: (1) tools and dye molds; (2) various cut for steroids; (3) chemistry equipment and steroid bottle caps; (4) electronic scales and pill capsules; (5) vacuum pump and MecoMatic Pulsafeeder; (6) numerous electronic devices; (7) a bitcoin wallet on a Nano 5; (8) a money counter; and (9) approximately $42,448 in cash.

Also seized by law enforcement were eight firearms and ammunition for them. Specifically, Fusco possessed (1) one Kahr Pistol bearing serial number IQ8747 and related ammunition, (2) one XDM Springfield Pistol bearing serial number MG896959 and related ammunition, (3) one Heritage Pistol bearing serial number C69585, (4) one F1 Rifle bearing serial number 120-02478 and related ammunition, (5) one Glock Pistol 9mm bearing serial number ABRV975 and related ammunition, (6) one Remington Pistol .380 bearing serial number RM006542C and related ammunition, (7) one Smith and Wesson Revolver .38 bearing serial number CPJ7017 and related ammunition and (8) One Glock 27 Pistol bearing serial number HBK051 and related ammunition.

United States Postal records, the defendant's own banking records, and emails provided by CW-1 additionally corroborated CW-1's account. Specifically, a search of Postal records conducted on June 6, 2017 showed that CW-1 had received multiple parcels from Philadelphia in a pattern consistent with his statement to law enforcement since February of 2017. Specifically, the previous parcels exhibited a pattern of two parcels arriving from Philadelphia on the same date, approximately every two weeks. An analysis of Fusco's bank account showed that, during the

3

period from approximately January 13, 2016 to approximately December 15, 2016, Fusco received 54 credits totaling $92,841.46 to this TD Bank account from Coinbase or Circle Internet, both of which are bitcoin exchangers. Finally, emails between Fusco and CW-1 from late March 2017 through the date of Fusco's arrest showed that Fusco provided CW-1 with the names, addresses, and orders of his customers.

## PROCEDURAL BACKGROUND

On June 16, 2017, the defendant was arrested pursuant to a federal criminal complaint, charging him with conspiracy to possess with intent to distribute and to distribute controlled substances, in violation of 21 U.S.C. § 846. On December 19, 2017, the defendant pled guilty to an two-count Information, charging the same count as well as one count of possession of a tableting machine or any equipment used to manufacture a controlled substance, in violation of 21 U.S.C. § 843(a)(7).

The maximum sentence for Count One is 10 years in prison, 2 years to lifetime supervised release, and a $500,000 fine. The maximum sentence for Count Two is four years in prison, one year of supervised release, and a $250,000 fine. A special assessment of $200 is mandatory, pursuant to 18 U.S.C. § 3013.

The parties and Probation agree that the counts of conviction are grouped together. For Count One, they further agree that the defendant's base offense level is at least 16 pursuant to U.S.S.G. §§ 1B1.3 and 2D1.1(c)(13) and note 8 to § 2D1.1 because the defendant conspired to possess at least 213,868 pills consisting of a mixture and substance containing alprazolam (a schedule IV substance, which converts to 13, 366.75 grams of marijuana) and 26,040 units of a

4

mixture and substance containing anabolic steroids (a schedule III substance, which converts to 26,040 grams of marijuana), resulting in an aggregate amount of 39 kilograms of marijuana.

They further agree that the base offense level should be adjusted as follows: (1) two levels added pursuant to U.S.S.G. § 2D1.1(b)(7) because the defendant distributed a controlled substance through mass-marketing by means of an interactive computer service; and (2) two more levels added pursuant to U.S.S.G. § 2D1.1(b)(12) because the defendant maintained premises for the purpose of manufacturing a controlled substance. The resulting base offense level under this calculation would be 20. As discussed in depth below, the government contends that two more points should be added pursuant to U.S.S.G. § 2D1.1(b)(1) because the defendant possessed a dangerous weapon while engaging in drug trafficking. If the Court accepts the government's position, the base offense level would be 22.

With respect to Count Two, the parties and Probation agree that, pursuant to U.S.S.G. § 2D1.12, the base offense level is 12 because the defendant intended to manufacture a controlled substance with the imported and prohibited pill press. Two levels are added pursuant to U.S.S.G. § 2D1.1(b)(7) because the defendant distributed a controlled substance through mass marketing by means of an interactive computer service. The resulting base offense level is 14.

Pursuant to U.S.S.G. § 3D1.4, the highest base offense level is either 20 or 22 for Count One, which is one unit.  Because the difference between the base offense levels are between five and eight levels apart, half a unit is assigned to Count Two.  Thus, there are one and a half units in the combined offense level, resulting in an additional point pursuant to U.S.S.G. § 3D1.4(b). Additionally, two levels are added pursuant to U.S.S.G. § 3B1.1 because the defendant was an organizer, leader, manager or supervisor of the criminal conduct and three levels are subtracted

5

under U.S.S.G. § 3E1.1 for acceptance of responsibility, resulting in a total adjusted offense level of either 20 or 22.

The parties agree that the defendant falls within Criminal History Category I. A total offense level 22, assuming a Criminal History Category I, would result in a range of 41 to 51 months of imprisonment (sentencing table) and a fine range of $15,000 to $150,000, U.S.S.G. § 5E1.2(c)(3). A total offense level 20, assuming a Criminal History Category I, would result in a range of 33 to 41 months of imprisonment (sentencing table) and a fine range of $15,000 to $150,000, U.S.S.G. § 5E1.2(c)(3). Under either scenario, the defendant is also subject to a supervised release term of at least two years. U.S.S.G. § 5D1.2.

## DISCUSSION

### A.     *Sentencing Standards*

In accordance with the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), and the Second Circuit's decision in *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), the sentence to be imposed must be reached through consideration of the advisory Guidelines and all of the factors identified in 18 U.S.C. § 3553(a). In so doing, the Court has a statutory responsibility "to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing," *Kimbrough v. United States*, 552 U.S. 85, 102 (2007) (quoting 18 U.S.C. § 3553(a)).

The Guidelines, consisting of offense characteristics and various grounds for departure, address all of the considerations relevant to sentencing, as articulated in 18 U.S.C. §3553 including, but not limited to "(1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed -- (A) to reflect the

seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; ... (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense."  Accordingly, in determining an appropriate sentence for the defendant, the Court must take into account *all* of the factors delineated in Section 3553.

### B.  *Application of These Sentencing Factors to the Instant Case*

Applying these factors, there is no question that the defendant's crime was serious. The defendant oversaw a drug operation in which he bought, pressed and redistributed across the country Xanax and steroids via the web. As noted above, the defendant is responsible for more than 200,000 Xanax pills alone.

According to the National Institute of Drug Abuse, "[m]ore than 30 percent of overdoses involving opioids also involve benzodiazepines, a type of prescription sedative commonly prescribed for anxiety or to help with insomnia. Benzodiazepines (sometimes called "benzos") work to calm or sedate a person, by raising the level of the inhibitory neurotransmitter GABA in the brain. Common benzodiazepines include diazepam (Valium), alprazolam (Xanax), and clonazepam (Klonopin), among others." *See* https://www.drugabuse.gov/drugs-abuse/opioids/benzodiazepines-opioids. Indeed, in 2017, there were approximately 9,000 overdose deaths nationally attributed to Benzos. *See* http://www.ct.gov/dmhas/lib/dmhas/adpc/(9)_benzodiazepines.pdf. That is nearly four times that

amount of such death in 2002. *Id.* In 2017 in Connecticut, 313 people died because of lethal mixture of benzos and other opioids. *See* https://www.ct.gov/ocme/lib/ocme/AccidentalDrugIntoxication2012-2017.pdf.

Additionally, the defendant distributed these drugs via the dark web from his home, in which he had a veritable arsenal of firearms. As noted above and in his plea agreement, the defendant admits – as he must – to maintaining firearms in his home. It was also clear from the items seized from his home that he made steroids in his residence and maintained drug proceeds and tools of his trade (namely, his computers). Hence, two more points should be added pursuant to U.S.S.G. § 2D1.1(b)(1).

Faced with similar facts, the Second Circuit Court of Appeals upheld this enhancement in *Untied States v. Sweet*, 25 F.3d 160 (2d Cir. 1994). There, the defendant did not sell drugs from the residence where the guns were located and no drugs or drug paraphernalia were found at the home. The evidence, however, proved that the defendant stored and 'cut' drugs for distribution at the home in the past. The Court held that the enhancement applied, holding that the Court had "previously upheld the imposition of a weapons adjustment under § 2D1.1(b)(1) when a weapon was present on the premises where the drugs were being stored, even if the evidence did not show that the weapon was 'possessed during commission of the offense'." *Id.* at 162-63 (citing *United States v. Pellegrini*, 929 F.2d 55, 56 (2d Cir.1991) (per curiam), *United States v. Wilson*, 11 F.3d 346, 355 (2d Cir.1993), and *United States v. Schaper*, 903 F.2d 891, 896 (2d Cir.1990) for the proposition that the enhancement applies when a gun is found in a residence where drugs, drug proceeds and/or records of transaction were kept).

There is little to mitigate the seriousness of the defendant's crime. The defendant comes from a generally loving family. Despite the fact that his parents live separately, they appear to have cared for him all his life and attempted to help him to address his drug dependency during his adolescence. As to his drug dependency, he has been sober for many years, and his drug dealing does not have any nexus to that illness. While he has a work history, it appears that an injury prevented him from continuing in his union work and hence, he turned to drug trafficking. Although that may explain his conduct, it does not excuse it. His loving family, his intelligence, his work history, and his lack of criminal history are all indicators that reduce the likelihood of his recidivism. They, however, do not diminish the need to punish him for his conduct.

## CONCLUSION

As detailed above, the offense in this case is serious and the Court's sentence must address that sentencing factor as well as the need to promote respect for the law and afford adequate general deterrence to criminal conduct. Thus, the United States respectfully requests that the Court take notice of the foregoing and impose an appropriate sentence.

Dated: February 19, 2019
      Bridgeport, CT

                              Respectfully submitted,

                              JOHN H. DURHAM
                              UNITED STATES ATTORNEY
                              By: **/s/**
                              VANESSA RICHARDS
                              ASSISTANT UNITED STATES ATTORNEY
                              Bar Number: PHV 05095
                              UNITED STATES ATTORNEY'S OFFICE
                              1000 LAFAYETTE BOULEVARD
                              BRIDGEPORT, CT 06604
                              (203) 696-3016
                              Vanessa.richards@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 19, 2019, a copy of the above submission was filed electronically. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/
VANESSA RICHARDS
ASSISTANT UNITED STATES ATTORNEY
PHV 05095
(203) 696-3000